**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CYNTHIA CREMENS,**                          Case No. 1:18 CV 995

      Plaintiff,

      v.                                        Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,**

      Defendant.                                MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Cynthia Cremens[1] ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in September 2014, alleging a disability onset date of August 5, 2010. (Tr. 210-11). Her claims were denied initially and upon reconsideration. (Tr. 126-43). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 145). Plaintiff

---

1. The evidence in this case references several different spellings of Plaintiff's last name, including Cremeans, and Cremenas. Additionally, some records reflect the name Cynthia Legg, which Plaintiff explains was her married name. *See* Doc. 13, at 1. There is no dispute over whether these records reference the party currently before the Court. The undersigned uses the spelling advanced by Plaintiff in her filings.

(represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on February 22, 2017. (Tr. 27-55). On June 20, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-21). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on May 1, 2018. (Doc. 1).

## FACTUAL BACKGROUND[2]

Personal Background and Testimony

Born in 1970, Plaintiff was 40 years old on her alleged onset date. *See* Tr. 20, 210. Plaintiff had an eighth-grade education, and stated she could do basic math and read. (Tr. 45). She also reported past work at a radio station. (Tr. 31-32). Plaintiff lost her job after an August 2010 involuntary inpatient psychiatric hospital stay. (Tr. 33-34). Plaintiff also had another psychiatric inpatient admission in the 1990s. (Tr. 35).

At the time of the hearing, Plaintiff received mental health treatment from the Charak[3] Treatment Center for depression, insomnia, mood swings, rage, "[e]pisodes where [she] tear[s] stuff up", and blackouts. (Tr. 34-35). Plaintiff testified to feeling "down" more than "up". (Tr. 35). During a down cycle – which could last "from a couple of days to over a month." (Tr. 35), Plaintiff did not get out of bed, and ate less (Tr. 36). Plaintiff also testified to rage episodes where she would "get so mad [she] can't remember what [she] do[es]". (Tr. 36). During such episodes, she had hit her kids, torn up things in her house, and poured a gallon of paint over "everything in [her] house." (Tr. 36-37). Plaintiff was arrested based on her behavior in the past. (Tr. 37-38).

---

2. Because Plaintiff challenges only the ALJ's evaluation of her mental impairments, the Court summarizes only those relevant records and testimony.
3. This is spelled "Shiraq" in the transcript (Tr. 34), but records reveal the spelling to be "Charak". *See, e.g.,* Tr. 447.

Plaintiff had auditory hallucinations of music, talking, or people calling her name. (Tr. 38). Plaintiff testified she had been on psychiatric medication "[o]n and off since the early 90s". (Tr. 39). She saw Dr. Ranjan[4] "[o]n and off" for about two and a half years. (Tr. 40). She believed that her mental condition was "a lot worse" the past couple of years. *Id.* She had a "hard time concentrating and remembering". (Tr. 45).

Relevant Medical Evidence

In August 2010, Plaintiff was involuntarily admitted to River Point Behavioral Health for three days after making statements about suicide. (Tr. 309). On discharge, Plaintiff was assessed with bipolar disorder ("seemingly Type II, most recent episode Hypomanic without Psychotic Features in acute exacerbation, now in discrete remission"), alcohol abuse, not otherwise specified, and "[n]ormal grieving (?)". (Tr. 498). Treatment notes reference the unexpected death of Plaintiff's father. (Tr. 499). Plaintiff was discharged into her family's custody to attend her father's funeral and was noted to be "normally grieving her father's unexpected death", and at that time manifested no suicidal ideations. *Id.*

In November 2014, Plaintiff underwent an intake evaluation with psychologist Charel Khol, with Affiliates in Behavioral Health. (Tr. 398-401). Plaintiff reported having moved to Cleveland in June 2014 after living in Florida. (Tr. 398). She reported past diagnoses of bipolar disorder, panic attacks, and agoraphobia. *Id.* Plaintiff reported no psychiatric medication for the prior three years. *Id.* On mental status examination, Plaintiff's general appearance/behavior was appropriate, cooperative, open, alert, oriented, and confused, with good eye contact. (Tr. 400). Her speech was clear, coherent, relevant, and spontaneous. *Id.* Her cognitive functioning was noted to

---

4. This is spelled "Rangen" in the transcript (Tr. 40), but later records reveal the correct spelling to be "Ranjan". *See, e.g.,* Tr. 452.

be within normal limits, but she had immediate memory problems. *Id.* She had below average

intellect and fair insight/judgment. *Id.* Dr. Khol offered diagnoses of 296.80 (bipolar disorder) and

300.01 (panic disorder).[5] (Tr. 401). He assigned a "[c]urrent" Global Assessment of Functioning

("GAF") score of 52, and a "[p]ast [y]ear" score of 57.[6] *Id.* Dr. Khol commented that Plaintiff had

a history of mood swings and agoraphobia and had "[n]ever had treatment that is required to

manage bipolar." *Id.*

One week later, Plaintiff underwent a psychological consultative examination with Amber

L. Hill, Ph.D. (Tr. 341-51). Plaintiff reported she was "off [her] medication" and was applying for

disability in part because she was "bipolar, manic depress[ive], borderline suicidal." (Tr. 341). On

examination, Dr. Hill noted Plaintiff was dressed appropriately and was well-groomed. (Tr. 346).

She had normal motor behavior and maintained appropriate eye contact. *Id.* Plaintiff had a coherent

thought process and fluent, clear speech. *Id.* There was no evidence of hallucinations, delusions,

or paranoia. *Id.* Plaintiff's affect was full and appropriate, and mood was "only slightly

dysthymic." (Tr. 347). Dr. Hill did not observe any anxiety in the interview, or in the waiting room.

*Id.* Plaintiff was oriented and her attention, concentration, and recent/remote memory "appeared

intact". *Id.* Dr. Hill opined Plaintiff's overall intellectual functioning to be "within a below average

range". *Id.* Dr. Hill assessed persistent depressive disorder (early onset, mild), agoraphobia, and

alcohol use disorder (moderate). *Id.* Dr. Hill opined Plaintiff's prognosis was "guarded" because

---

5. Diagnosis codes 296.80 and 300.01 refer to bipolar disorder not otherwise specified, and panic disorder without agoraphobia, respectively. *See* Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 400-01, 440 (4th ed., Text Rev. 2000) ("*DSM-IV-TR*").

6. A GAF score is a "clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503, n.7 (6th Cir. 2006). A score between 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR* at 34.

she was "not currently engaged in any mental health treatment related to her reported mental health concerns and states that she has not had treatment for the past one to two years." (Tr. 348).

The following month – December 2014 – Shura Hegde, M.D. (also at Affiliates in Behavioral Health), completed an intake evaluation of Plaintiff. (Tr. 395-96). Plaintiff reported taking Lamictal, for one month, but "ha[d] not been taking it on a regular basis". (Tr. 395). Plaintiff had mood swings, fatigue, depression, and decreased motivation; she also reported financial stress and not wanting to be around people. *Id.* Dr. Hegde observed Plaintiff was "in no apparent distress" and reported her mood "was fine". (Tr. 396). She had an appropriate affect, normal speech, linear thought process, and normal thought content. *Id.* She denied hallucinations, had intact memory, and limited judgment. *Id.* Dr. Hegde assessed a history of type two bipolar disorder, severe alcohol use disorder in remission, marijuana use disorder, rule out substance abuse, mood disorder. *Id.* She assessed a GAF score of "[a]bout 52 to 55". *Id.* Dr. Hegde prescribed Seroquel and Brintellix and instructed Plaintiff to follow up with counseling. *Id.*

In February 2015, Dr. Khol completed a brief mental status examination form. (Tr. 394). In it, she noted Plaintiff was disheveled, with dirty clothes. *Id.* Plaintiff had a calm and cooperative attitude, normal speech, and behavior. *Id.* Her affect was flat and blunted, and her mood was irritable, anxious, and depressed. *Id.* Her thought processes were disorganized; she did not have suicidal or homicidal ideations, but had fears of leaving home and being around others. *Id.* She had no perceptual disturbances, and was oriented. *Id.* She had "some disruption in thoughts". *Id.* At the same time, Dr. Khol completed a daily activities questionnaire. (Tr. 392-93). In it, she noted Plaintiff lived with her disabled spouse, and children (ages 22 and 15). (Tr. 392). She noted Plaintiff had difficulty getting along with family and neighbors, but her sister-in-law drove her to appointments. *Id.* She noted Plaintiff reported that she did not get along with former employers,

supervisors, and coworkers because "she's always argumentative and some[times] aggressive." *Id.* When asked for examples that might prevent work activities, Dr. Khol noted Plaintiff was easily stressed out, had blacked out at times, had poor concentration and restlessness, did not get out of bed some days, had mood swings, depression, and anxiety, and would not be able to be safe around equipment. *Id.* She also noted Plaintiff rarely engaged in food preparation ("doesn't pay attention [and] burns meal") or shopping ("can 'run in' for a few things w[ith] someone with her"). *Id.* She observed Plaintiff's personal hygiene was poor. *Id.* She did not drive and was afraid of public transportation. *Id.* Dr. Khol described Plaintiff's current treatment as once per month for psychotherapy, and noted Plaintiff saw Dr. Hegde for psychiatric medication. *Id.*

Plaintiff saw Rakesh Ranjan, M.D., and Michelle Steele, L.P.N., at the Charak Center for Health and Wellness for a medication review visit in January 2016. (Tr. 447-52). Plaintiff rated her depression as 8/10 and attributed this to the "extra stress" of the holidays, and being off her medication. (Tr. 447). She reported missing an appointment and running out of medication. *Id.* She reported her symptoms had worsened, with daily panic attacks, poor sleep, and no appetite. *Id.* She also, however, reported bathing regularly and keeping up with her activities of daily living. *Id.* She wanted to get back on medication to help with her anxiety, depression, and sleep. *Id.* On mental status examination, she was noted to be well-groomed, with average eye contact and motor activity. (Tr. 449). Her demeanor was cooperative, and her speech was normal. *Id.* Her thought content contained no delusions, but she reported auditory and visual hallucinations. *Id.* Her mood was euthymic and her affect constricted. (Tr. 450). She was oriented, her reasoning ability was intact, and her memory was normal. *Id.* She was noted to have average insight, fair judgment, normal impulse control, and moderately impaired energy and concentration. *Id.* Dr. Ranjan continued Plaintiff's medications (Seroquel XR, Lamotrigine, Abilify, and Klonopin). (Tr. 451).

She was instructed to continue individual therapy sessions to identify coping mechanisms and stress reduction techniques. *Id.*

*Opinion Evidence*

At her November 2014 consultative examination, Dr. Hill offered an opinion regarding Plaintiff's limitations. (Tr. 349-51). She opined Plaintiff appeared able to understand, remember, and carry out instructions and that there "does not appear to be any significant limitation in this area." (Tr. 349). She noted Plaintiff appeared able to maintain attention and concentration and perform simple and multi-step tasks "as evidenced by her presentation within the clinical interview setting, her performance on the mental status exam tasks, and her reported daily functioning, in which she completes numerous multi-step tasks independently[.]" *Id.* She noted Plaintiff "may have some limitation in maintaining persistence and pace" due to her depression symptoms, but noted that she "might have improvements in this area if she were to engage in mental health treatment, such as counseling and therapy or medical for possibly symptom control or relief." *Id.* Dr. Hill also opined Plaintiff appeared able to respond appropriately to supervisors and coworkers in a work setting based on her conduct during the interview, and her "report of positive socialization in her life". (Tr. 350). She acknowledged Plaintiff's self-reported agoraphobia, "which could possibly cause difficulty in this area", but noted she had not observed such symptoms in the interview or the waiting area, and that it was "difficult to determine" whether mental health treatment" would help with this. *Id.* Finally, Dr. Hill opined Plaintiff "may have some difficulty" responding appropriately to work pressures in a work setting based on her reported agoraphobia and alcohol use. *Id.* Dr. Hill continued:

> Having said that, the claimant's reported concerns with anxiety related symptomatology of agoraphobia were not observed within the clinical interview setting. Further, the claimant did not report any difficulty in this area in her reported work history. It is possible if the claimant were to engage in mental health

treatment, such as counseling and therapy or medication, that she could have positive benefit, including symptom control or relief in this area.

(Tr. 350-51).

In February 2015, Dr. Khol completed a mental status questionnaire. (Tr. 389-91). Dr. Khol noted she first saw Plaintiff on November 18, 2014, and had last seen her on February 16, 2015 (the date on the questionnaire). (Tr. 389). Dr. Khol observed Plaintiff was disheveled, with a depressed, anxious, and irritated mood, and a flat and blunted affect. (Tr. 389). She noted Plaintiff cried when anxious and did not like to be around others or leave her home. *Id.* Dr. Khol observed Plaintiff's concentration was very poor and it was difficult for her to focus on one topic. *Id.* ("mind wanders during sessions"). Further, Dr. Khol noted Plaintiff reported throwing things at home, or sometimes "black[ed]" out (not from alcohol) and did not remember her actions. *Id.* Dr. Khol opined Plaintiff could remember, understand, and follow directions "[i]f written down" due to memory problems. (Tr. 390). She opined Plaintiff had a "poor" ability to maintain attention because she "tends to jump to other areas" or "turn off if a problem or conflict" arises. *Id.* Dr. Khol also opined Plaintiff could not sustain concentration, persist at tasks, or complete them in a timely fashion, observing: "takes long time to complete tasks – problems with organizing thoughts and plan[ning] ahead." *Id.* Dr. Khol also observed Plaintiff had "great difficulty" in social interaction and stayed away from others, noting by way of example that she did not shop for many things, but sent family members instead. *Id.* Dr. Khol also opined Plaintiff would not be able to make adjustments to work pressures because she is "extremely anxious in situations that she perceives as unknown and trapped". *Id.*

Also in February 2015, state agency reviewing psychologist Juliette Savitscus, Ph.D., reviewed Plaintiff's records and opined Plaintiff was moderately limited in social functioning and maintaining concentration, persistence or pace, and mildly limited in activities of daily living. (Tr.

64). Dr. Savitscus opined Plaintiff was moderately limited in her ability to work in coordination with or in proximity to others without being distracted and moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. (Tr. 67-68). She opined Plaintiff could "perform simple and moderately complex tasks (1-4 steps) in a work environment without fast-paced production standards." (Tr. 68). Dr. Savitscus also opined Plaintiff was moderately limited in her ability to interact with the general public, but "retain[ed] the ability to work in a setting requiring infrequent and superficial interactions with the public." (Tr. 68-69). Finally, she opined Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but "retain[ed] the ability to function in an environment with infrequent changes that can be explained in advance." (Tr. 69). Within her opinion, Dr. Savitscus noted where her opinion diverged from Dr. Khol's opinion. *See* Tr. 65, 67-69.

In May 2015, the State agency sent Affiliates in Behavioral Health a Mental Status Questionnaire and Daily Activities Questionnaire forms. (Tr. 404-09). The forms were returned with a handwritten note: "Was seen by physician only 1 time this year. Dr. will not fill out!!!" (Tr. 405).

In August 2015, Paul Tangeman, Ph.D., affirmed Dr. Savitscus's opinion. (Tr. 102-04).

In September 2015, Dr. Ranjan and Kelly Stevenson, LISW, completed a form entitled "Medical Source Statement: Patient's Mental Capacity". (Tr. 440-41). In it, they opined Plaintiff could rarely: use judgment, maintain attention and concentration for extended periods of 2 hour segments, maintain regular attendance and be punctual, deal with the public, interact with supervisors, function independently without redirection, work in coordination with or proximity to others without being distracted, complete a normal workday and workweek without interruption

from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, understand, remember, and carry out complex job instructions, relate predictably in social situations, and manage funds/schedules. *Id.* Plaintiff could occasionally: follow work rules, respond appropriately to changes in routine settings, relate to coworkers, work in coordination with or proximity to others without being distracted, deal with work stress, understand, remember and carry out simple or complex job instructions, socialize, behave in an emotionally stable manner, and leave home on her own. *Id.* She could frequently maintain her appearance. (Tr. 441). As the diagnoses and symptoms to support the assessment, they noted:

> (1) bipolar [disorder] 1, mixed, severe with psychotic features – sad mood, anhedonia, low energy, low self-esteem, poor focus, sleep disturbance, auditory hallucinations, impulsive spending, psychomotor agitation, racing thoughts, pressured speech, (2) panic [disorder] [with] agoraphobia. Severe panic attacks every 2 mo[nths] or so, minor attacks more regularly. Panic in public places or even certain parts of her home.

*Id.* Dr. Ranjan and Ms. Stevenson indicated Plaintiff had been under their practice's care since May 8, 2015. *Id.*[7]

VE Testimony

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience with the residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 48). The VE testified such an individual could not perform Plaintiff's past work, but could perform other jobs such as dining room attendant/cafeteria worker, cleaner/housekeeper, or inspector/hand packager. (Tr. 51). The VE also testified that the limitation for a worker being

---

7. The record contains no treatment or examination notes prior to September 2015. *See* Tr. 442-52. Handwritten on a Charak Center fax cover sheet responding to a request for records from November 1, 2015 to November 1, 2016 (Tr. 44), is the notation: "Client was seen one time during requested dates." (Tr. 442). The submitted record is dated January 7, 2016. (Tr. 447-52).

off-task in an unskilled setting is ten percent, and that adding a limitation of two absences per month would be work preclusive. (Tr. 52-53).

ALJ Decision

In her June 2017 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2014, and had not engaged in substantial gainful activity since August 5, 2010, her alleged onset date. (Tr. 13). She found Plaintiff had severe impairments of: spine disorder, affective/bipolar disorder, anxiety disorder, and history of polysubstance abuse, but that these impairments – singly or in combination – did not meet or medically equal a listed impairment. (Tr. 13-15). The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: frequent climbing of ramps/stairs, occasional climbing of ladders/ropes/scaffolds, frequent stooping and crawling, can perform simple and some more complex tasks in a work environment without fast paced production standards, can work in a setting requiring infrequent and superficial interaction with the general public, and can function in an environment with infrequent changes that can be explained in advance.

(Tr. 16). The ALJ then found Plaintiff was unable to perform any past relevant work (Tr. 19), but given her age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform (Tr. 20). Therefore, the ALJ found Plaintiff not disabled from her alleged onset date (August 5, 2010), through the date of the decision (June 20, 2017). (Tr. 21).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters,* 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred in her evaluation of the opinion evidence. Specifically, she argues the ALJ failed to properly evaluate the opinion of treating sources Drs. Khol and Ranjan, and that the ALJ's weighing of non-treating physician opinion was inconsistent with her weighing of treating physician opinion. For the reasons discussed below, the undersigned affirms the Commissioner's decision.

<u>Treating Physician Rule</u>

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[8] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of*

---

8. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in September 2014 and thus the previous regulations apply.

*Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

A medical source becomes a treating source when the Plaintiff has seen him or her with "a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Further, "[t]he treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his condition over a long period of time will have a deeper insight into the medical condition than a person who has examined a claimant but once, or who has only seen

the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Thus, the Sixth Circuit has found two or three visits insufficient to establish a treating physician relationship such that the physician's opinion is entitled to the deference of the treating physician rule. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016) ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month period."); *Mireles x rel. S.M.M. v. Comm'r of Soc. Sec.*, 608 F. App'x 397, 398 (6th Cir. 2015) ("On appeal, Mireles claims that the ALJ rejected Dr. Jeney's 'treating source opinion' without a legal basis and ignores the lower court's classification of Dr. Jeney as a non-treating source. He fails to persuade us that the lower court misclassified Dr. Jeney, who examined S.M.M. no more than three times."); *Yasmin v. Comm'r of Soc.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("two examinations did not give [the physician] a long term overview of [claimant's] condition").

Preliminarily, the undersigned finds that the ALJ was not required to afford treating physician rule deference to either Dr. Khol's or Dr. Ranjan's opinion. At the time of her opinion, Dr. Khol had only seen Plaintiff twice – once for initial evaluation in November 2014, and once on the date she provided her opinion in February 2015. *See* Tr. 398-401, 392-94. There are no prior or subsequent records from Dr. Khol.[9] Two visits in three months does not trigger the "assumption that [Dr. Khol] . . . has dealt with a claimant and [her] condition over a long period of time [and therefore] . . . ha[s] a deeper insight into the medical condition", *Barker*, 40 F.3d at 794; *see also Kepke*, 636 F. App'x at 629; *Mireles*, 608 F. App'x at 398; *Yasmin*, 67 F. App'x at 885. Similarly, there are no treating records pre-dating Dr. Ranjan's September 2015 opinion. The

9. Indeed, when the State agency sent a subsequent request in May 2015 to Dr. Khol's practice – Affiliates in Behavioral Health with Mental Status Questionnaire and Daily Activities Questionnaire forms (*see* Tr. 404-09) – the forms were returned uncompleted with a handwritten note: "Was seen by physician only 1 time this year. Dr. will not fill out!!!" (Tr. 405).

ALJ acknowledged that Dr. Ranjan reported he had been seeing Plaintiff since May 2015, she also pointed out that there were no supporting notes. *See* Tr. 18; Tr. 441 (noting Plaintiff had been seen at the Charak Center since May 8, 2015). There is therefore no evidence that Dr. Ranjan qualified as a "treating physician" at the time he offered his opinion. Thus, the undersigned concludes the ALJ was not required to give "good reasons" for the weight assigned to either Dr. Khol's or Dr. Ranjan's opinion.

The undersigned finds Plaintiff's citation to *Montanez v. Commissioner of Social Security*, 2013 WL 6903764 (N.D. Ohio) unavailing. In *Montanez*, the district court explained:

> [O]f particular relevance in the area of managing psychological impairments, courts have noted that the accepted medical practice is that a psychiatrist may prescribe and manage medications while not seeing a patient with any regularity, instead basing the treatment prescribed on routinely receiving reports and evaluations from others who provide the "hands-on" interaction with the patient.
> With that accepted medical practice in mind, the Ninth Circuit has stated that the regulations defining a treating source "neither explicitly forbid[] or require" assigning that status to a physician who actually sees the claimant "a few times" or "as little as twice a year." Rather, as the text of the regulation itself explicitly states, the test is whether the source has seen the claimant with the frequency medically required by the treatment or evaluation at issue in the context of the claimant's impairment. Thus, merely taking note of the number of visits by itself is not enough to either show that the contacts are sufficient to establish a treating relationship or that conclusively they are not.

2013 WL 6903764, at *8 (citations omitted). In the same vein, Plaintiff presents argument about the "team approach" to treatment. (Doc. 14, at 12). However, the problem with both of these arguments is that Plaintiff fails to point to notes from other "team" members, or evidence of a more elaborate treatment relationship than the few visits in the record.

Because these physicians were not treating sources as contemplated by the regulations, the ALJ was only required to *explain*, rather than give good reasons, for discounting their opinions. *See* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address

medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). For the reasons discussed below, the undersigned finds she did so here. Moreover, the undersigned finds that the reasons provided would also satisfy the "good reasons" requirement of the treating physician rule. That is, the reasons provided by the ALJ and discussed further below satisfy the regulatory requirement of reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4).

*Dr. Khol*

The ALJ explained her rationale for discounting Dr. Khol's opinion:

> Charel Khol, Ph.D., completed a medical source statement on February 16, 2015 (Exhibit 6F at 6). Dr. Khol concluded that the claimant is easily stressed, has trouble concentrating, and some days does not even get out of bed. She would also not be able to be safe around equipment. Dr. Khol indicated that the claimant also has memory problems. The undersigned gives little weight to the conclusions of Dr. Khol. This source knew the claimant for only three months and had been seeing the claimant monthly. Therefore, it is difficult to get a sense of the frequency and consistency of these limitations. In addition, during an initial examination, Dr. Khol noted that the claimant appeared appropriate, with good eye contact. She was somewhat confused, anxious, and sad with a flat affect. Speech was clear, cognition was within normal limits, and insight/judgment were fair. Dr. Khol also assigned the claimant a GAF score of 52, which is indicative of only moderate symptoms.

(Tr. 18).

This explanation addresses several of the factors required by the regulations, namely treatment relationship, consistency, and supportability. *See* 20 C.F.R. §§ 404.1527(c)(2)-(4); 416.927(c)(2)-(4). First, the ALJ could appropriately assign less weight to Dr. Khol's opinion based on her limited treating relationship with Plaintiff. *See Kepke*, 636 F. App'x at 629 ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month period."). Plaintiff argues it was error for the ALJ to discount

Dr. Khol's opinion on this basis when she later credited the opinion of a one-time examining physician. However, this was not the only reason the ALJ provided. Moreover, although Plaintiff objects to the ALJ's statement that "it is difficult to get a sense of the frequency and consistency of these limitations" (Tr. 18), on the page prior, the ALJ noted inconsistencies in observed findings around the time of Dr. Khol's opinion:

> The claimant underwent an outpatient mental health evaluation [with Dr. Khol] in November 2014 (Exhibit 6F at 11). On examination, the claimant appeared appropriate, with good eye contact. However, she was somewhat confused, anxious, and sad with a flat affect. Speech was clear, cognition was within normal limits, and insight/judgment were fair. *During another mental status examination the following month* [with Dr. Hegde], the claimant was in no apparent distress, mood was reportedly fine, and affect was appropriate (Exhibit 6F at 9). Speech was at a normal rate and rhythm, though process was linear, thought content was normal, and memory was intact, but judgment was limited. Treatment records document a more stable mood with treatment (Exhibit 18F at 16).

(Tr. 17) (emphasis added). The undersigned finds that, in this context – where the ALJ specifically cited Dr. Hegde's contrasting findings the following month – the ALJ's rationale that "it is difficult to get a sense of the frequency and consistency of these limitations" (Tr. 18) is supported by substantial evidence.

Second, the ALJ noted Dr. Khol's objective observations, specifically those at her initial examination, were not entirely consistent with her opinion. This is an appropriate consideration. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4) (factors of consistency and supportability). The ALJ cited Dr. Khol's initial examination findings to support her determination that Dr. Khol's opinion was disproportionately restrictive to her objective findings. For example, the fact that Plaintiff "appeared appropriate, with good eye contact" (Tr. 18) (citing Tr. 400) is reasonably read to contradict Dr. Khol's finding that Plaintiff had more extreme difficulty with any social interaction (Tr. 390). Plaintiff's normal cognition, also cited by the ALJ (Tr. 18) (citing Tr. 400) can also be reasonably read to contradict Dr. Khol's more restrictive findings that Plaintiff could

only follow written directions, was unable to maintain attention or sustain concentration (Tr. 390). Although Plaintiff reads Dr. Khol's opinion differently – arguing her findings are consistent – the ALJ's contrary interpretation is not unreasonable. This also provides a reasonable contrast to the ALJ's finding with respect to Dr. Hill – wherein she assigned "significant weight to the conclusions of Dr. Hill as they are supported by objective signs and findings upon examining the claimant." (Tr. 18).

Third, the ALJ reasonably found Dr. Khol's opinion unsupported by her assessment of a GAF score of 52, which indicates "moderate" symptoms. (Tr. 18) (citing Tr. 401). Notably, in this same record, Dr. Khol opined Plaintiff's GAF score for the past year was even higher – 57. (Tr. 401). Again, both of these scores indicate "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR* at 34. The Sixth Circuit has found that consistency with the remainder of the record, as well as an inconsistent GAF score provides substantial evidence to discount a consultative examiner's opinion. *See Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462 (6th Cir. 2017) (upholding ALJ's decision discounting consultative examiner opinion because the remainder of the record did not support it and the examiner himself ascribed a GAF of 60 to the claimant, which indicates only mild symptoms); *Gribbins v. Comm'r Soc. Sec. Admin.*, 37 F. App'x 777, 779 (6th Cir. 2002) (finding treating physician opinion "properly rejected because it was contradicted by other medical evidence, including another treating physician's GAF score."); *Demastus v. Colvin*, 2017 WL 570928, at *9 (N.D. Ohio) ("In the Sixth Circuit, an ALJ may discount a treating physician's opinion based, at least in part, on a contradictory GAF score."), *report and recommendation adopted sub nom.*, *Demastus v. Comm'r of Soc. Sec.,* 2017 WL 564795 (N.D. Ohio). The ALJ reasonably found this

assigned GAF score to be inconsistent with Dr. Khol's more limiting opinion which stated, e.g., that Plaintiff had "great difficulty" with social interaction, would "not be able to" make adjustments to a work setting or work pressures, and had no ability to sustain concentration and poor ability to maintain attention. (Tr. 390).

Taking these reasons together, the undersigned finds the ALJ provided reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to [Dr. Khol's] medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). As such, there is no reversible error.

*Dr. Ranjan*

The ALJ also explained her rationale for discounting Dr. Ranjan's opinion.

Rakesh[] Ranjan, M.D., completed a medical source statement on September 25, 2015 (Exhibit 13F). Dr. Ranjan concluded that the claimant can primarily "rarely" perform work tasks involved with making personal adjustments. She can occasionally understand, remember, and carry out simple and detailed job instructions. However, she can occasionally to rarely perform tasks involved with making personal and social adjustments. The undersigned gives little weight to the conclusions of Dr. Ranjan. There was a brief treating relationship as she had only seen Dr. Ranjan since May 2015. There are also few related progress notes. The claimant's representative requested treatment records from November 2015 to November 2016 and there was only one progress note from January 2016 (Exhibit 14F at 1-2). At that time, the claimant was cooperative, motor activity and eye contact were average, speech was clear/normal, and thought process was logical (Exhibit 14F at 6). However, the claimant did report auditory and visual hallucinations. The claimant's mood was euthymic, affect was constricted, and attention/concentration were impaired. While these objective findings support some limitations in functioning, they do not support such extreme limitations as Dr. Ranjan has proposed.

(Tr. 18). Again, this analysis comports with the regulations, and is supported by substantial evidence of record. First, as discussed above, the ALJ reasonably cited the limited treatment relationship. Here, although Dr. Ranjan indicated he began treating Plaintiff in May 2015, there are no contemporaneous notes. And, even so, the ALJ reasonably found that a four-month treating

relationship (particularly one where the ALJ did not know how many visits occurred during that time period) was "limited". *See* 20 C.F.R. § 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion); 20 C.F.R. § 404.1527(c)(2)(ii), 416.927(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s), the more weight we will give to the source's medical opinion. WE will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed[.]").

Second, the ALJ cited the lack of "related progress notes", which speaks to the supportability of Dr. Ranjan's opinion and its consistency with the record as a whole. *Id.* As noted, although Dr. Ranjan indicated he began seeing Plaintiff in May 2015, there are no such records. It is ultimately Plaintiff's burden to provide evidence sufficient for the ALJ to make a disability determination. 20 C.F.R. §§ 404.1512(a), 416.912(a); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). Other courts within this circuit have explained that the absence of progress notes significantly undermines an argument that a physician's opinion is entitled to great weight. *See, e.g., Bruza v. Comm'r of Soc. Sec.*, 2008 WL 3979261, at *6 (W.D. Mich) ("The absence of progress notes and other contemporaneous medical records regarding the treatment provided by [a physician] for the period at issue entitles his unadorned opinion to virtually no weight."). Although Dr. Ranjan here provided some explanation for his opinion, logically, it is impossible for the ALJ to evaluate whether this is consistent with Dr. Ranjan's treatment of Plaintiff if there are no contemporaneous notes. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion . . . the more weight we will give that medical opinion. The better an explanation a source provides for a medical

opinion, the more weight we will give that medical opinion."); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Third, the ALJ cited the only progress note from Dr. Ranjan in the record (even though it post-dated his opinion), and reasonably found that the objective findings therein – though limiting – were not consistent with the "extreme" limitations in his opinion. (Tr. 18) (citing Tr. 447-52). As the ALJ summarized on the preceding page:

> In January 2016, the claimant reported increased depression; however, she was off her medications for weeks and failed to follow-up with scheduled appointments (Exhibit 14F at 6). On examination at that time, the claimant was cooperative, motor activity and eye contact were average, speech was clear/normal, and thought process was logical. However, the claimant did report auditory and visual hallucinations. The claimant's mood was euthymic, affect was constricted, and attention/concentration were impaired.

(Tr. 17-18). Thus, the ALJ reasonably determined that although this treatment note supported some restrictions on Plaintiff's ability to perform work activities, they did not support the degree of limitations to which Dr. Ranjan opined. Dr. Ranjan's opinion was extremely limiting, finding Plaintiff could "rarely" (defined as "activity cannot be performed for any appreciable time"): use judgment; maintain attention and concentration for two-hour segments; maintain regular attendance; deal with the public; interact with supervisors; function independently without redirection; work in coordination with or proximity to others without being distracted; complete a normal workday and workweek without interruption from psychologically-based symptoms; understand, remember, and carry out complex job instructions; manage funds or schedules, and relate predictably in social situations. (Tr. 440-41). Moreover, Dr. Ranjan opined Plaintiff could only "occasionally" (defined as "ability for activity exists for up to 1/3 of a work day"): follow work rules; respond appropriately to changes in routine settings; relate to coworkers; work in

coordination with or proximity to others without being distracting; deal with work stress; understand, remember, and carry out detailed or simple job instructions; socialize; behave in an emotionally stable manner; and leave home on one's own. *Id.* The ALJ reasonably determined that Dr. Ranjan's opinion was disproportionate to the level of limitation suggested by his observations at the January 2016 examination. Moreover, as the ALJ noted on the previous page, these findings came at a time when Plaintiff had been off her medication for several weeks. (Tr. 17).

The undersigned therefore finds no error in the ALJ's consideration of Dr. Ranjan's opinion, even under the treating physician "good reasons" standard. These reasons address the regulatory factors of treatment relationship, consistency, and supportability, and are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4).

Within her brief Plaintiff also argues the ALJ provided an inconsistent rationale in affording the opinion of Dr. Hill "great" weight" when Dr. Hill only saw Plaintiff on one occasion, noting that "the decision not only accepts Dr. Hill's opinion regarding Ms. Cremens' mental limitations, but even more speculative issues, such as how Ms. Cremens' condition could see "improvement" based on [her] one evaluation[.]" (Doc. 13, at 12). First, the undersigned finds this is not an inappropriate consideration considering the other evidence in the record – cited by the ALJ – of Plaintiff's lack of treatment. *See* Tr. 17 ("In November 2014, the claimant reported to a consultative examiner that she had not engaged in mental health treatment in 1-2 years.") (citing Tr. 344); Tr. 17 ("In January 2016 . . . she was off her medications for weeks and failed to follow up with scheduled appointments.") (citing Tr. 447). Indeed, as the Commissioner points out, even Dr. Khol noted in November 2014 that Plaintiff "never had the treatment that is required to manage

bipolar." (Tr. 401). Moreover, the ALJ relied on Dr. Hill's opinion as stated, wherein she opined Plaintiff "may have some limitation in maintaining persistence and pace related to her depressive symptomatology . . . [but] might have improvements in this area" with treatment. (Tr. 349). The ALJ accommodated this in the RFC, limiting Plaintiff to no fast-paced production standards. (Tr. 16). Dr. Hill also opined Plaintiff:

> appears able to respond appropriately to supervisors and coworkers" but also noted Plaintiff "does report symptoms related to agoraphobia . . . which could possibly create difficulty in this area. However, these reported symptoms were not observed within the clinical interview setting or waiting area. It is difficult to determine if the claimant were to participate in counseling and therapy or mental health medication if this could help provide some symptoms control relief in this area.

(Tr. 350). Again, the ALJ provided a related limitation – "infrequent and superficial interaction with the general public." (Tr. 16). Finally, Dr. Hill opined that Plaintiff "may have some difficulty in her ability to respond appropriately to work pressures within a work setting based on the claimant's reported symptoms of agoraphobia and her extensive alcohol use[.]" (Tr. 350). Dr. Hill continued: "Having said that, the claimant's reported concerns with anxiety related symptomatology of agoraphobia were not observed within the clinical interview setting. Further, the claimant did not report any difficulty in this area in her reported work history. It is possible if the claimant were to engage in mental health treatment, such as counseling and therapy or medication, that she could have positive benefit, including symptom control or relief in this area." (Tr. 350-51). Again, the ALJ offered a related limitation in the RFC – "can function in an environment with infrequent changes that can be explained in advance." (Tr. 16). The undersigned finds the that ALJ did not inappropriately rely on any "speculative" opinion by Dr. Hill, but rather credited the opinion as it was based on her objective observations during the examination. That is, the ALJ did not rely on Plaintiff's condition as theoretically improved with treatment, but relied on Plaintiff's condition as Dr. Hill observed it to be.

Finally, the undersigned notes that the ALJ included significant mental restrictions in the RFC, limiting Plaintiff to "perform[ing] simple and some more complex tasks in a work environment without fast paced production standards", "work in a setting requiring infrequent and superficial interaction with the general public", and "an environment with infrequent changes that are explained in advance." (Tr. 16). The restrictions in the RFC were further supported by the opinions of the State agency physicians, to which the ALJ assigned great weight. *See* Tr. 19, 67-69, 102-04. Although Plaintiff takes a different, and not unsupported, view of the evidence, the undersigned must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's consideration of the opinion evidence in this case and the decision is therefore affirmed.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.

 s/ James R. Knepp II
United States Magistrate Judge